

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------x

PAUL BERGER, Individually and On Behalf
of All Others Similarly Situated,

                     Plaintiffs,

    vs.

TARRAGON CORPORATION, WILLIAM S.
FRIEDMAN, ROBERT P. ROTHENBERG
and ERIN D. PICKENS,

                Defendants.

----------------------------------------x

Civil Action No. 07 CV 8689

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

    1.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Tarragon Corporation ("Tarragon" or the "Company") between January 5, 2005 and August 9, 2007 (the "Class Period"), against Tarragon and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

    2.    Tarragon is a homebuilder and real estate developer. The Company operates two distinct businesses: a homebuilding and real estate development business, and a real estate services business. The homebuilding business focuses on developing, renovating, building and marketing homes in high-density, urban locations and in master-planned communities. The real estate services business provides asset and property management, leasing and renovation services to residential and commercial properties. Tarragon is headquartered in New York, New York.

    3.    During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. As a result of defendants' false statements, Tarragon stock traded at artificially inflated prices during the Class Period, reaching a high of $26.76 per share on July 22, 2005.

## JURISDICTION AND VENUE

4.     Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Securities and Exchange Commission ("SEC" Rule 10b-5 promulgated therender, 17 C.F.R. §240.10b-5.

5.     (a)     Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

(b)     Tarragon's principal executive offices are located at 423 West 55th Street, 12th Floor, New York, New York.

## PARTIES

6.     Plaintiff purchased Tarragon common stock as described in the attached certification and were damaged thereby.

7.     Defendant Tarragon is a homebuilder and real estate developer that engages in homebuilding and real estate development, and real estate service businesses in the United States. The Company develops, renovates, builds, and markets high and mid-rise condominiums; town homes, traditional new developments, and low-rise condominiums; and low and mid-rise rental apartment communities in the urban locations and communities. The Company also engages in land development and conversion of existing rental apartment communities to condominiums and offers real estate services, such as property management, condominium management, and acquisition and renovation of apartment properties, as well as provides mortgage lending services.

8.     Defendant William S. Friedman ("Friedman") is, and at all relevant times was, Chairman of the Board, a director and Chief Executive Officer ("CEO") of Tarragon.

9.     Defendant Robert P. Rothenberg ("Rothenberg") is, and at all relevant times was, President, Chief Operating Officer ("COO") and a director of Tarragon.

10.     Defendant Erin D. Pickens ("Pickens") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of Tarragon.

Defendants Friedman, Rothenberg and Pickens (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Tarragon's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements..

## BACKGROUND

11.     Tarragon engages in homebuilding and real estate development, and real estate service businesses in the United States. The Company develops, renovates, builds, and markets high and mid-rise condominiums; town homes, traditional new developments, and low-rise condominiums; and low and mid-rise rental apartment communities in the urban locations and communities. The Company also engages in land development and conversion of existing rental apartment communities to condominiums and offers real estate services, such as property management, condominium management, and acquisition and renovation of apartment properties, as well as provides mortgage lending services.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

12.     On January 5, 2005, Tarragon issued a press release entitled "Tarragon Corporation

Affirms 2004 Guidance and Releases 2005 Earnings Forecast." The press release stated in part:

> Tarragon Corporation, a leading homebuilder specializing in the development and
> marketing of high-density residential communities and a real estate investor with a
> portfolio of approximately 14,000 apartments, today reaffirmed its previous guidance
> for 2004, forecasting net income of $42 to $46 million, or approximately $2.40 to
> $2.60 per share, versus net income for fiscal 2003 of $31.2 million or $1.80 per share
> in each case on a fully diluted basis.
>
> Tarragon Corporation simultaneously announced its 2005 earnings guidance.
> Net income for fiscal 2005 is expected to be $75 to $80 million, or approximately
> $3.85 to $4.10 per share, fully diluted, based on projected total consolidated revenue
> of $475 to $525 million. Most of the growth in earnings and revenue is from closings
> that are included in the $400 million Homebuilding Division contract backlog.
> Homebuilding Division pretax net income is expected to range from $110 to $115
> million. Homebuilding Division sales revenue, including revenue from
> unconsolidated joint ventures, is projected to be $700 to $750 million with a gross
> margin over 24 percent.
>
> Investment Division growth in 2005 will come from the completion and
> lease-up of the 860 rental apartments currently under development, as well as
> opportunistic acquisitions of existing communities such as the 510 apartment
> portfolio in Manchester/West Haven, Connecticut, currently under purchase contract.
> Moreover, based on higher occupancy and rent levels, especially in Florida, Tarragon
> anticipates Investment Division net operating income, including net operating
> income from unconsolidated joint ventures, of $65 to $70 million, a 5 percent
> improvement over 2004.
>
> Tarragon Chairman and Chief Executive Officer, William S. Friedman,
> commented, "2004 was a banner year for the Homebuilding Division and 2005
> should be even better. Our investments over the past 12 to 36 months, in both
> product and people, are now bearing fruit. We look forward to continuing to find and
> develop new projects as we realize revenues from our growing number of active, for-
> sale communities."

13.     Upon this positive representation of the Company's results and business outlook, on

January 5, 2005, Tarragon's stock jumped $2.59 per share – a 22% increase over the previous day's

close – to close at $14.59 per share on high volume.[1]

14.     On March 16, 2005, the Company issued a press release entitled "Tarragon

Corporation Reports Record Results for 2004; Company Will Expand Homebuilding and Strengthen

Balance Sheet by Selling Substantial Portion of Rental Portfolio." The press release stated in part:

> Tarragon Corporation, a leading urban homebuilder specializing in the development
> and marketing of high-density residential communities, announced today that its
> consolidated revenues for 2004 grew to $311 million, up 136 percent from revenues
> of $131.6 million in 2003. Increased revenue primarily reflects strong home sales,
> which grew, on a consolidated basis, from $56.3 million in 2003 to $220.5 million in
> 2004.
>
>     The Company also reported record profits of $44.7 million, representing a 43
> percent increase over 2003 net income of $31.2 million. Following the Company's 3-
> for-2 stock split that was effective February 10, 2005, and on a fully diluted per-share
> basis, earnings increased 41 percent year-to-year from $1.20 to $1.69. Income tax
> expense in 2004 was $15 million, while in 2003 there was no income tax due to the
> application of net operating loss carry-forwards.
>
>     As a result of the growth in profitability of the Company's homebuilding
> business, Tarragon has adopted a strategic plan to sell a substantial portion of the
> assets in its rental portfolio (Investment Division). The Company will redeploy the
> capital now invested in these rental properties to support further expansion of
> homebuilding and to strengthen its balance sheet.
>
>     Chairman and CEO William Friedman commented, "Tarragon is now
> principally an urban homebuilder, and to a much lesser extent an owner and manager
> of rental properties. Virtually all of our operating profits come from homebuilding
> while over half of our assets are still invested in rental properties. Moreover, the
> large amount of debt associated with our rental properties distorts the financial
> strength of our Company, impeding our continued rapid growth. At the same time,
> the market value of our rental properties has continued to increase due to their
> performance and current market conditions. As a result, we see an opportunity to
> realize cash through the sale of our rental properties and redeploy a substantial
> portion of the capital invested in the rental portfolio to reduce debt and expand our

---

[1]     All share and per share amounts are adjusted for the 3-for-2 stock split in February 2005.

homebuilding activities. We plan on retaining approximately 2,000 apartments for conversion to condominiums or redevelopment."

Friedman said that Tarragon, together with its investment bankers, Lazard Freres & Co. LLC, examined various strategies for obtaining the best value for shareholders from the investment portfolio, including a spin-off and IPO. He said that the analyses demonstrated that the maximum shareholder value is likely to result from selling a substantial portion of the portfolio to support the fast-growing and highly profitable homebuilding operations.

Friedman added, "Using the rental portfolio as a non-dilutive source of further homebuilding capital will be, we believe, strongly accretive to earnings while allowing us to reduce debt and get the highest possible return on shareholder assets."

15.    On March 16, 2005, the Company filed its Form 10-K for fiscal 2004, which included

results for the fourth quarter 2004, and included the same financial results previously reports. The

Form 10-K also included a certification by Friedman, which stated:

I, William S. Friedman, certify that:

1. I have reviewed this annual report on Form 10-K of Tarragon Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

- 6 -

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

16.   Defendant Pickens signed a nearly identical certification in the Form 10-K.

17.   On May 11, 2005, the Company issued a press release entitled "Tarragon Corporation Reports First-Quarter 2005 Results; Net Income $21.6 Million vs. $1.9 Million; Value of Active Developments and Pipeline Soars 74 Percent to $3.3 Billion, Raises Guidance on 2005 Homebuilding Sales and Earnings." The press release stated in part:

Tarragon Corporation, an urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its first-quarter 2005 results and provided higher guidance for 2005.

Total consolidated revenues increased 57 percent to $80.6 million, from first-quarter 2004 revenues of $51.4 million. Consolidated homebuilding sales rose 76 percent to $63.6 million, from first-quarter 2004 homebuilding sales of $36.1 million. Net income, after provision for income taxes of $13.9 million, was $21.6 million in the first quarter of 2005 versus $1.9 million for the same period last year. There was no provision for income taxes in the first quarter of 2004. Income from continuing operations, after a tax provision of $7.3 million, grew six-fold to $11.4 million compared to $1.8 million in the first-quarter 2004, which had no tax provision. Fully diluted earnings-per-share for the first-quarter 2005 were $0.70 compared to $0.07 per share for the first-quarter 2004.

Tarragon's rapid growth is illustrated by the following:

- Total homebuilding revenue, including revenue from unconsolidated subsidiaries, grew 233 percent from $36.1 million in the first quarter of 2004 to $120 million in the first quarter of 2005

- 527 homes worth $178 million were delivered in the first quarter of 2005, compared to 85 homes worth $17.7 million in the first quarter of 2004

- 800 new contracts worth $257.6 million were signed in the first quarter of 2005 versus 315 contracts worth $47.6 million during the like period in 2004. The average price of the new contracts signed in 2005 was $322,000 compared to $250,000 in 2004

- Total contract backlog as of March 31, 2005, increased 81 percent to $423.5 million from $234 million at March 31, 2004

- Total value of homes in active developments (including backlog) increased 80 percent from $1.0 billion at March 31, 2004, to nearly $1.8 billion at March 31, 2005

- The pipeline of future developments nearly doubled over the past twelve months from 2,600 homes, with a potential sales value of $880 million as of March 31, 2004, to over 5,100 homes with an estimated sales value of $1.5 billion as of March 31, 2005.

Tarragon Chairman and CEO William Friedman commented, "The pace of our homebuilding activity continues to accelerate -- sales, closings, acquisitions and new opportunities. We foresee continued rapid growth in the quarters ahead, and anticipate delivering more than 3,000 homes to buyers during the remainder of 2005. Despite moving several projects from pipeline to active development our pipeline grew 23 percent in the first quarter. This expanding pipeline, coupled with our active developments, now totals more than 10,000 homes."

Capital Redeployment Activities

Tarragon's capital redeployment strategy announced in March 2005 is proceeding rapidly. The Company is developing a disposition strategy for 39 rental properties with a market value of $275 million. Twenty seven of these properties are being actively marketed for sale. Of these, the Company has contracts or offers in hand on 14 properties totaling $96.6 million, which would result in pre-tax gains on sale of approximately $44 million.

Tarragon has also identified a portfolio of 27 high-quality rental properties, representing 6,500 units with a fair market value in excess of $500 million that it hopes to refinance and contribute to a joint venture with a financial partner to free up approximately $150 million in capital and reduce consolidated debt by over $190 million. These properties, in Connecticut and the southeast, achieved same-store NOI growth of 8.2 percent in the first quarter of 2005 compared to same quarter of 2004.

- 8 -

Tarragon expects to manage the proposed joint venture and retain a minority interest in it. The joint venture is expected to acquire existing apartment communities within core markets and buy new rental properties to be developed by Tarragon.

Finally, eight rental properties comprising 2,500 apartments with a book value of $178 million will be retained for conversion to condominiums as market conditions warrant. These properties have an estimated condominium sellout exceeding $400 million.

Friedman commented, "Since adopting this strategic plan in mid-March we have moved quickly to implement it. We will continue to provide updates on the redeployment program throughout the year."

Revised Guidance

In January 2005 Tarragon estimated 2005 net income of $75 to $80 million. This estimate assumed $53 to $58 million of after-tax income from continuing operations (principally homebuilding activities) and $22 million in after-tax gain on sale of properties. With the decision to substantially divest the rental portfolio, Tarragon expects to realize extraordinary gains on sale of properties in 2005 that will materially exceed the January guidance.

Accordingly, the Company believes that for 2005, guidance based on its after-tax income from continuing operations (essentially excluding gain on property sales) will be more meaningful. Based on current backlog and activity, Tarragon expects total Homebuilding sales, including revenue from unconsolidated joint ventures, to range from $775 million to $825 million for 2005, which is 10 percent higher than the guidance issued in early January. Based on this increased sales volume, and somewhat higher than originally anticipated margins, Tarragon is increasing its guidance for after-tax income from continuing operations by 33 percent to a range of $70 to $75 million.

18.    On May 10, 2005, the Company filed its Form 10-Q for the second quarter of 2005, which included the financial results reported on May 11, 2005. The Form 10-Q contained virtually identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as cited above in ¶22.

19.    On August 9, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Second-Quarter 2005 Results; Revenue Up by 51 Percent; Backlog Up by 75 Percent; Pipeline Grows to 7,000 Homes." The press release stated in part:

Tarragon Corporation, a leading homebuilder specializing in the development and marketing of high-density residential communities, announced its second-quarter results and affirmed its guidance for 2005.

Total revenues for the quarter ended June 30, 2005, increased to $85 million, 51 percent higher than second-quarter 2004 revenues of $56.1 million. Net income for the second quarter ended June 30, 2005, was $9.1 million, versus $17.2 million in the prior year's second quarter, which included an income tax benefit, gain on sale and other nonrecurring items of $12.7 million. Diluted earnings per share for the second quarter 2005 were $0.30 compared to $0.65 in the second quarter of 2004. Pre-tax earnings from continuing operations increased 43 percent to $13.2 million this quarter from $9.3 million in the second quarter 2004.

For the six-month period revenues were $164.1 million, up 55 percent over the prior period revenues of $106.1 million. The six-month net income was $30.7 million, up 60 percent over the prior year net income of $19.1 million, which also included the income tax benefit, gain on sale and other nonrecurring items mentioned above. Diluted earnings per share for the six-month period were $0.99 compared to $0.73 in the prior year.

Tarragon Chairman and CEO William Friedman commented, "Revenues for the quarter grew by 51 percent. This increase is even more impressive when we note that more than $40 million in sales were pushed out to the third quarter ending September 30 due to an unusual delay in processing condominium filings for one sold out condominium conversion project in Florida; those sales have now closed. Sales and pricing in all markets where we are participating continue to meet our highest expectations. Last weekend, for example, we signed contracts for 47 homes worth $14 million. Based on our growing contract backlog and the continued high rate of new sales, we affirm our guidance for the year."

Consolidated homebuilding revenue rose 64 percent to $69.1 million, from second-quarter 2004 homebuilding revenue of $42.1 million. Total homebuilding revenue including revenue from unconsolidated joint ventures, grew 217 percent from $42.1 million in the second quarter of 2004 to $133.3 million in the second quarter of 2005. For the six-month period ended June 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $253.4 million (including $68.4 million accounted for under the percentage of completion method on four projects), up 224 percent over the same period last year.

The increase continues a growth trend that has seen record numbers of home deliveries. In the quarter ended June 30, 2005, 651 homes worth $163.5 million were delivered, compared to 77 homes worth $18.2 million in the second quarter of 2004. For the six-month period, 1,178 homes worth $341.5 million were delivered, compared to 162 homes worth $35.9 million during the same period last year.

Income from Continuing Operations, after provision for income taxes of $5.2 million, was $8.1 million in the second quarter of 2005. Second quarter 2004 Income

- 10 -

from Continuing Operations of $14.3 million included a $5.0 million income tax benefit resulting from the Company's reversal of a valuation allowance against a deferred tax asset. For the six months ended June 30, 2005, Income from Continuing Operations before income tax tripled to $32 million from $10.8 million for the same period 2004.

Tarragon's contract backlog grew to $554 million as of June 30, 2005 – an increase of 75 percent over the year-earlier backlog of $316 million. The June 30, 2005, backlog included $114 million that has been recognized under the percentage of completion method, while the June 30, 2004, backlog included $137 million that had been recognized under the percentage of completion method. There were 1,186 new contracts worth $295.5 million signed in the second quarter of 2005 at an average price of $249,000 versus 385 contracts worth $110.6 million for an average price of $287,000 during the second quarter 2004. In total, 1,986 new orders have been executed during the first six months of 2005 at contract prices totaling $553 million or an average sale price of $278,500 versus 667 new orders during the first half of 2004 worth $152 million or an average sale price of $228,000.

The total value of homes in active developments (including backlog) increased 112 percent from $941 million at June 30, 2004, to nearly $2.0 billion at June 30, 2005, of which 50 percent are condominium conversions, 20 percent are mid-rise developments, 12 percent luxury high-rise buildings and 18 percent traditional townhouse communities. These active projects are expected to generate gross margins of 26 percent, 30 percent, 21 percent and 22 percent respectively – overall the average gross margin is projected at 26 percent. During the second quarter, 11 new projects were begun, bringing the total number of homes to over 6,700 in 38 communities. Tarragon's weighted-average ownership interest in the active communities is 81 percent.

Tarragon's pipeline of future developments grew to more than 7,000 homes in 21 communities as sites were acquired or optioned for 14 new communities during the quarter. Based on estimated potential revenue, 11 percent of the development pipeline is expected to be derived from condominium conversions, 28 percent from mid-rise development, 55 percent from high-rise and six percent from town-homes. Tarragon has a 77 percent weighted-average ownership interest in the development pipeline. Collectively, Tarragon's portfolio of active projects and development pipeline now includes 58 projects representing 14,600 homes (including land development) of which 40 percent are located in the North East, 56 percent are located in the South East and four percent are in other locations.

Company Affirms Guidance

Based on the current backlog and scheduled closings, as well as additional sales volume expected to be generated from its active communities, Tarragon affirmed its earlier Guidance of 2005 After Tax Income from Continuing Operations of $70 – $75 million dollars.

20.    On August 9, 2005, the Company filed its Form 10-Q for the second quarter of 2005,

which included the same financial results previously reported. The Form 10-Q contained virtually

identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as

cited above in ¶22.

21.    On November 9, 2005, the Company issued a press release entitled "Tarragon

Reports Record Results for Third Quarter 2005; Raises Full-year 2005 Estimate and Guides 2006

Earnings per Share from Continuing Operations with Growth of at Least 65 Percent Over 2005."

The press release stated in part:

> Tarragon Corporation, the urban homebuilder specializing in the development and
> marketing of high-density residential communities, announced its third-quarter
> results and raised its guidance for 2005.
>
> Third-quarter Financial highlights:
>
> *    Fully diluted EPS reached $1.70 vs. $0.14 in the prior year
>
> *    Fully diluted EPS from continuing operations of $1.01 vs. $0.14 in
>      the prior year
>
> *    Total consolidated homebuilding revenues of $243.4 million,
>      representing a 328 percent increase over third quarter 2004
>
> *    Home deliveries of 1,160 at an average price of $243,000, resulting in
>      sales of $281.0 million
>
> *    New orders of 962 homes worth $271.0 million, at an average price
>      of $282,000
>
> *    Backlog value $540.0 million, up 51 percent over the previous year
>      backlog of $357.0 million
>
> *    Total value of active developments increased to more than $2.3
>      billion, representing over 7,500 homes in 43 communities
>
> *    Additional future development pipeline of 8,600 homes in 24
>      communities
>
> *    Stockholders' equity as of September 30, 2005, of $291.3 million, up
>      from $130.6 million one year earlier

2005/2006 Guidance:

* 2005 EPS from continuing operations of $2.27 - $2.42, up from $2.17-$2.32 (excludes estimated income from previously announced investment division capital redeployment program and the charge associated with conversion of senior convertible notes)

* 2006 consolidated homebuilding revenues of at least $1.0 billion and EPS from continuing operations of at least $4.00 representing an increase of more than 65 percent over 2005 revised guidance

2005 third-quarter net income was $50.5 million, or $1.70 per fully diluted share, compared to $3.9 million, or $0.14 per fully diluted share in 2004. Included in third-quarter 2005 net income is $22.4 million in after-tax gains on sale of investment assets. Total consolidated revenues for the quarter ended September 30, 2005, increased 264 percent to $260.1 million from third-quarter 2004 revenues of $71.5 million. Income from continuing operations increased more than seven-fold to $28.1 million this quarter from $3.8 million in the third quarter 2004. Third-quarter 2005 income from continuing operations included a one-time charge of $7.2 million relating to the conversion of $54.25 million of senior convertible notes into common stock.

Net income for the nine-month period was $81.1 million, or $2.70 per fully diluted share, up 252 percent over the prior year net income of $23.0 million, or $0.87 per fully diluted share. Included in the 2005 net income is $31.4 million of after-tax gains on sales of investment assets compared to $2.7 million for the same period last year. For the nine-month period total consolidated revenues were $425.4 million, up 138 percent over the prior period revenues of $178.7 million. For the nine months ended September 30, 2005, income from continuing operations was up 143 percent to $47.8 million, or $1.67 per fully diluted share, from $19.7 million, or $0.74 per share, for the same period 2004.

Consolidated homebuilding revenue rose 328 percent to $243.4 million from third-quarter 2004 homebuilding revenue of $56.9 million. Total homebuilding revenue, including revenue from unconsolidated joint ventures, grew 442 percent to $308.5 million in the third quarter 2005, from $56.9 million in the third quarter of 2004. For the nine-month period ended September 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $561.9 million, up 316 percent from $135.1 million in 2004.

Tarragon Chairman and CEO William S. Friedman commented, "Sales have continued at a strong pace in Florida, South Carolina and New Jersey. October was one of our strongest months ever with 429 new orders worth $92.0 million, despite lost selling days due to weather. Based on the strength of this quarter's results and our contract backlog which, as of October 31, stood at $600.0 million, we have raised our guidance for the year and set a floor to our 2006 earnings expectations of $4.00 per share, fully diluted."

\*    \*    \*

Company Raises 2005 Guidance and Announces 2006 Guidance

Based on the current backlog and scheduled closings, Tarragon is raising its 2005 guidance of after-tax income from continuing operations to $73.0 - 78.0 million or $2.27 - $2.42 per fully diluted share, before income from the investment division capital redeployment program and costs associated with the conversion of its senior convertible notes in August 2005.

Tarragon also announced that it anticipates 2006 consolidated revenues in excess of $1.0 billion and income from continuing operations of at least $4.00 per fully diluted share.

22.    On November 9, 2005, the Company filed its Form 10-Q for the third quarter of 2005, which included the same financial results previously reported. The Form 10-Q contained virtually identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as cited above in ¶22.

23.    On March 15, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Record 2005 Financial Results – 2005 Net Income of $146 Million or $4.71 Per Diluted Share Up 231 Percent – Income From Continuing Operations of $3.36 Per Diluted Share, Up 173 Percent – Full-Year Consolidated Revenue Up 102 Percent – Total Homebuilding Sales Up 133 Percent – Board Authorizes Additional One Million Share Repurchase Plan – Company Announces $0.10 Per Share Dividend – 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share." The press release stated in part:

Tarragon Corporation, a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced record financial results for the year ended December 31, 2005.

Tarragon also announced an annual dividend of $0.10 per share, payable on May 1, 2006 to shareholders of record as of the close of business on April 10, 2006, and a one million share increase in share repurchase authorization.

Consolidated revenue for the full year 2005 was $571.9 million, up 102% from $282.9 million in 2004. Substantially all of the revenue increase was due to very strong homebuilding sales, which for the year totaled $504.7 million, up 129%

from $220.5 million in 2004. Homebuilding sales, including revenue from unconsolidated properties, were $735.5 million in 2005, up 133% from $315.5 million in 2004.

Net income for 2005 was $145.8 million, or $4.71 per diluted share, compared to $44.7 million, or $1.65 per diluted share, in 2004.

"Tarragon has posted a record year with these solid financial results," said Chairman and CEO William S. Friedman. "Our focused growth strategy is gaining traction and we expect to continue that momentum in 2006, even as the unprecedented growth rates that our industry has enjoyed in the past few years begin to moderate. We continue to strengthen our balance sheet and take steps to allow investors to participate in our growth, including declaring a dividend and repurchasing shares in the market. We believe that the long-term industry fundamentals remain very strong, especially in our urban markets."

During 2005 we executed a record 3,899 new orders worth $963 million, up 178% over 1,404 new orders worth $360 million, in 2004. Tarragon delivered 3,343 homes in 2005 at an average price of $268,000, excluding lots, resulting in sales of $878 million compared to 942 home deliveries in 2004 at an average price of $259,000, excluding lots, or $215 million in total sales. For the fourth quarter ended December 31, 2005, 527 new orders were executed worth $138.8 million up from 513 new orders during the same period last year worth $129.7 million. Home deliveries in the fourth quarter of 2005 totaled 949 worth $251 million compared to 526 home deliveries during the same period last year worth $144.6 million. As a result of the strong sales activity, the Company's non-cancelable contractual backlog rose 25% to $427.3 million, compared to the year earlier figure of $342.7 million.

Mr. Friedman commented, "While overall buyer traffic at our developments remains robust, some of our markets are returning to historically normal levels of housing sales activity. We have, for example, noted a marked slowdown in certain investor-driven West Coast Florida markets, but elsewhere in Florida the level of activity is only low compared to the unusually high levels of last year. Our guidance for 2006 assumes continued sluggishness in these West Coast Florida communities and moderate sales levels, in line with historical norms for the remainder of the market. In the Northeast, where we are opening sales offices for three new communities in the next month, pricing is stable, traffic is high and we are not anticipating a comparable slowdown in sales levels."

\*       \*       \*

2006 Guidance

The Company is issuing full-year 2006 earnings guidance of $3.70 to $4.20 in Income from Continuing Operations per diluted share. The Company anticipates additional income from the completion of the capital redeployment program.

24.     On March 16, 2006, the Company filed its form 10-K for fiscal 2005, which included results for the fourth quarter 2005, and included the same financial results previously reported. The Form 10-K contained virtually identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as cited above in ¶22.

25.     On May 10, 2006, the Company issued a press release entitled "Tarragon Corporation Announces First Quarter 2006 Financial Results; – Net Income of $18.8 Million or $0.59 Per Diluted Share." The press release stated in part:

> Tarragon Corporation, a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the quarter ended March 31, 2006.
>
> Financial Results
>
> Consolidated revenue for the first quarter of 2006 was $98.9 million, up 23 percent from $80.3 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $89.2 million, up 40 percent from $63.6 million in the first quarter of 2005. The increase in consolidated revenue was partially offset by a $7.0 million decrease in rental and other revenue, which resulted from the implementation of the Company's capital redeployment program announced in March 2005.
>
> Homebuilding sales, including revenue from unconsolidated properties, were $111.9 million in the first quarter of 2006, down from $120.0 million in the same period of 2005. In the prior-year quarter, 12 percent of homebuilding sales were derived from Northeast projects compared to 1.9 percent in the current quarter. Over the next two quarters, sales will commence at several projects in the Northeast representing more than $275 million in homebuilding revenue.
>
> Income from continuing operations of $11.5 million was equal to that of the first quarter 2005.
>
> Net income for the first quarter of 2006 was $18.8 million, or $0.59 per diluted share, compared to $21.6 million, or $0.70 per diluted share, in the first quarter of 2005, which included $10.3 million of after tax gains on sale of real estate compared to $7.3 million in the current quarter. Based on lower sales velocity in several markets in Florida, the Company increased its estimate of marketing and carrying costs on several of its developments. When estimates of project costs are revised, gross profit is adjusted in the period of change so that cumulative project earnings reflect the revised profit estimate. These adjustments decreased after tax net income in the first quarter of 2006 $5.1 million, or $0.16 per diluted share.

Accordingly, overall margins are expected to expand in future quarters, provided current sales rates continue as expected.

Tarragon Chairman and CEO William S. Friedman commented, "We are maintaining our guidance for the year and we expect that our results will be more robust during the second half as additional communities in the Northeast hit the market and contribute to earnings. While less than 2 percent of our homebuilding revenue was derived from projects in the Northeast in the first quarter, we expect the Northeast market to contribute 27 percent of total 2006 homebuilding revenue and over 35 percent of gross profits. We expect this trend to continue into 2007 as our Northeast activities begin to mature."

\*       \*       \*

2006 Guidance

The company reaffirmed its 2006 guidance of $3.70 to $4.20 income from continuing operations per diluted share, based on current market and sales trends, as well as anticipated income from the completion of its capital redeployment program during 2006.

26.    On May 10, 2006, the Company filed its Form 10-Q for the first quarter of 2006, which included the same financial results previously reported. The Form 10-Q contained virtually identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as cited above in ¶22.

27.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    In violation of GAAP, the Company had failed to consolidate an unprofitable variable interest entity into its consolidated financial statements; and

(b)    In violation of GAAP, the Company had failed to properly account for its statement of cash flows by failing to properly classify its cash inflows and cash outflows as operating, investing and financing activities.

28.     On August 9, 2006, the Company issued a press release entitled "Tarragon Corporation to Postpone Second Quarter Earnings Announcement and Conference Call; Company May Be Required to Consolidate Ansonia Partnership." The press release stated in part:

> Tarragon Corporation, a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced that it is reviewing its earlier determination that it was required to treat Ansonia Apartments, LP (Ansonia) as an unconsolidated partnership for financial reporting purposes. The review relates only to the interpretation of existing accounting literature and does not involve new facts or circumstances.
>
> Ansonia owns approximately 6,300 rental apartments primarily in Connecticut and Florida. Tarragon included summarized financial data from Ansonia's financial statements in notes to financial statements in the Company's 2005 Annual Report on Form 10-K.
>
> The Company is currently reviewing its accounting treatment of its investment in Ansonia with its independent accountants. If the Company concludes that it is required to consolidate Ansonia, the Company will be required to restate certain prior period financial statements. There would be no impact on income or revenue of the homebuilding division.

29.     This was the first in a series of partial disclosures and revelations concerning the truth about Tarragon's business operations, finances, business metrics and future business and financial prospects. Nonetheless, Tarragon's stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Class Period, was accompanied by denials and continued misrepresentations by defendants. Upon this partial disclosure, Tarragon's stock took a hit, closing down sharply at $10.30 per share on August 9, 2006 – a one-day decline of $1.67 per share or 14%.

30.     On August 24, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Second Quarter 2006 Financial Results; Second Quarter Net Income of $10.7 Million, or $0.34 Per Diluted Share, Up 22 Percent Over Second Quarter 2005 Net Income of $8.8 Million, or $0.28 Per Diluted Share." The press release stated in part:

Tarragon Corporation, a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the second quarter ended June 30, 2006.

Second Quarter Financial Results

Consolidated revenue for the second quarter of 2006 was $146.7 million, up 61 percent from $91.4 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $122.3 million, up 77 percent from $69.1 million in the second quarter of 2005.

Homebuilding sales, including revenue from unconsolidated properties, were $143.1 million in the second quarter of 2006, up from $133.3 million in the same period of 2005.

Income from continuing operations was $8.4 million in the second quarter of 2006, compared to $8.0 million in the same period of 2005.

Net income for the second quarter of 2006 was $10.7 million, or $0.34 per diluted share, up 22 percent from $8.8 million, or $0.28 per diluted share, in the second quarter of 2005. Included in the second quarter of 2006 is a $2.7 million expense associated with the write off of costs incurred for projects that have been cancelled.

Six-Month Financial Results

Consolidated revenue for the first six months of 2006 was $260.8 million, up 47 percent from $176.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, were $255.0 million in the first six months of 2006 compared to $253.4 million in the same period of 2005.

Income from continuing operations during the first six months of 2006 was $19.0 million compared to $19.4 million in the same period of 2005. Net income for the first six months of 2006 was down 6 percent to $28.6 million, or $0.90 per diluted share, compared to $30.4 million, or $0.98 per diluted share, in the comparable period of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Strong, higher-margin sales during the second quarter in our New Jersey communities, such as One Hudson Park in Edgewater and 1100 Adams in Hoboken, have helped to offset the weakness in many of our Florida condominium conversions, to produce revenue and net income that were substantially higher than the 2005 quarter. However, we expect the soft demand in the southeast markets, with lower margins resulting from increased carrying and marketing costs, to continue to apply pressure on our earnings. As a result, we are lowering our 2006 guidance for income from continuing operations per diluted share to $2.10 to $2.40. We expect net income, including discontinued operations, of $2.60 to $2.90 per diluted share.

Mr. Friedman continued, "Our outlook for 2007 remains solid because, in addition to completing the sellout of several profitable conversions from our rental portfolio, we expect significant profit from higher-margin properties now under construction, particularly in New Jersey. We believe our focus on unique waterfront developments meeting the demand from the growing number of non-traditional households and increased development of rental housing will help to insulate our operations from the conditions now impacting the broader market for residential real estate. Assuming a continuation of current market conditions, we expect net income in 2007 to at least equal that of 2006. Of particular importance, most of our condominium conversion sales are at communities where we have been selling for some time and have either paid off or substantially reduced the original acquisition financing. At June 30, the ratio of fully funded debt to total estimated sellout of our active conversions was 43 percent. Accordingly, each dollar of sales produces substantial free cash flow, giving us the financial flexibility we need to run our business, pay down debt and take advantage of opportunities."

\*    \*    \*

2006 Guidance

The Company anticipates $2.10 to $2.40 of income from continuing operations per diluted share in 2006, based on current market and sales trends and the impact of the Ansonia consolidation.

31.    On August 24, 2006, the Company filed its Form 10-Q for the second quarter of 2006, which included the same financial results previously reported. The Form 10-Q contained virtually identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as cited above in ¶22.

32.    On November 9, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Third Quarter 2006 Financial Results; Net Income of $6.0 Million or $0.19 Per Diluted Share for the Quarter Ended September 30, 2006 and $35.1 Million or $1.11 Per Diluted Share for the Nine Months Ended September 30, 2006." The press release stated in part:

Tarragon Corporation, a leading urban homebuilder specializing in the development and marketing of high-density residential communities, today announced its financial results for the third quarter and nine months ended September 30, 2006.

Third Quarter Financial Results

Consolidated revenue for the third quarter of 2006 was $119.2 million, compared to $265.3 million in the same period of 2005. Lower consolidated homebuilding revenue from condominium conversion closings in the Company's Florida markets from the year ago period accounts for the decrease.

Homebuilding sales, including revenue from unconsolidated properties, were $104.7 million in the third quarter of 2006, compared to $308.5 million in the third quarter of 2005.

Net income for the third quarter of 2006 was $6.0 million, or $0.19 per diluted share, compared to net income of $50.3 million, or $1.70 per diluted share, in the third quarter of 2005. Income from continuing operations was $2.8 million in the third quarter of 2006, compared to $28.2 million in the same period of 2005. Third quarter net income in 2005 included $22.4 million in after tax gains on sale of investment division properties, compared to $3.3 million in the third quarter of 2006.

Certain comparative results for 2005 have been restated to reflect the consolidation of Ansonia Apartments LP, as announced on August 22, 2006. Ansonia was previously treated as an unconsolidated partnership for financial reporting purposes.

Nine-Month Financial Results

Consolidated revenue for the first nine months of 2006 was $379.0 million, compared to $441.2 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, were $359.7 million in the first nine months of 2006 compared to $561.9 million in the same period of 2005.

Income from continuing operations during the first nine months of 2006 was $22.5 million or $0.71 per diluted share compared to $47.9 million or $1.67 per diluted share in the same period of 2005. Net income for the first nine months of 2006 was $35.1 million, or $1.11 per diluted share, compared to $80.7 million, or $2.69 per diluted share, during the same period of 2005. During the first nine months of 2006 the Company wrote off $5.0 million in costs related to deals no longer being pursued compared to $0.7 million in the first nine months of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Our third quarter results reflect the continued slow down in condominium conversion sales along with declining margins, particularly in Florida. However, as our condominium conversions slowly sell out, we are beginning to reduce debt and redeploy capital to higher-margin, new developments in New Jersey, Connecticut, Texas and Tennessee. In fact, during the first ten months of the year, we reduced debt associated with our condominium conversions by $164 million."

Mr. Friedman continued, "As a result of the continuing sales slowdown and lower margins, we are reducing our 2006 guidance for net income to $1.15 per

diluted share and for income from continuing operations to $0.75 per diluted share. Going forward, our growing pipeline of high-density, in-fill developments, primarily in New Jersey and Connecticut will help offset market weakness in Florida and be a key driver of revenue and net income growth in 2008 and beyond."

33.    On November 9, 2006, the Company filed its Form 10-Q for the third quarter of 2006,

which included the same financial results previously reported. The Form 10-Q contained virtually

identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as

cited above in ¶22.

34.    On March 19, 2007, the Company issued a press release entitled "Tarragon

Corporation Announces Fourth Quarter and Year End 2006 Financial Results; Debt on completed

condominiums reduced by nearly 50 percent in 2006." The press release stated in part:

Tarragon Corporation, a leading developer of multifamily housing for rent and for sale, today announced its financial results for the fourth quarter and year ended December 31, 2006.

Year End Financial Results

Based on unaudited results, net income for 2006 was $9.8 million, or $0.31 per diluted share, compared to $88.5 million, or $2.93 per diluted share, in 2005. 2006 net income was adversely impacted by unusual items including impairment charges, write-offs and gross margin adjustments of $34.9 million after tax, or $1.23 per share. Of this $34.9 million, $26.3 million is reflected in cost of sales, resulting from market driven margin reductions and impairments. The margin adjustments were made to reflect price reductions, slower absorption and increased marketing costs on unsold units. $6.4 million, after tax, is included in general and administrative expense, resulting from the write-off of pursuit costs on development projects that did not go forward. Finally, $2.2 million of impairment charges, after tax, represent the write-down of land inventory and properties held for sale to current estimated market value. This compares to $3.2 million of impairment charges and other write-downs, after tax, recorded in 2005. Loss from continuing operations for 2006 was $2.3 million or $(0.12) per diluted share compared to income from continuing operations of $45.8 million or $1.60 per diluted share in 2005.

The Company expects to report consolidated 2006 revenue of $544.9 million, an 8 percent decrease from $595.1 million in 2005, based on unaudited results. Homebuilding sales, including revenue from unconsolidated entities, decreased 31 percent to $508.2 million in 2006 from $735.5 million in 2005. Fewer condominium conversion closings in the Southeast market, which declined 34 percent from 2005, were the principal reason for the decline in revenue.

- 22 -

Tarragon Chairman and CEO William S. Friedman commented, "We have finished a disappointing year for the homebuilding industry and for Tarragon. We have used this period of slow sales to develop new marketing strategies, to reduce debt and to pursue developments with multiple exit strategies that work either as rentals or condominiums. Tarragon's long-term plan is to focus on smart growth and redevelopment projects in areas of high demand."

Fourth Quarter Financial Results

The Company expects to report a net loss for the fourth quarter of 2006 of $25.1 million, or $(0.89) per diluted share, compared to net income of $7.8 million, or $0.26 per diluted share, in the fourth quarter of 2005. Included in the fourth quarter of 2006 net loss were unusual items including impairment charges, write-downs and gross margin adjustments of $23.6 million after tax, or $0.83 per share. This $23.6 million includes $18.6 million from market driven margin reductions and impairments in cost of sales, $3.3 million from development pursuit costs written off to general and administrative expense and $1.7 million from impairment charges related to the write-down of land inventory and properties held for sale. No impairment charges or other write- downs were recorded in the fourth quarter of 2005. Loss from continuing operations was $25.6 million in the fourth quarter of 2006, compared to a loss of $2.9 million in the same period of 2005.

Based on unaudited results, consolidated revenue for the fourth quarter of 2006 was $163.8 million, an increase of 7.8 percent over consolidated revenue of $151.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, declined 14 percent to $148.5 million in the fourth quarter of 2006, compared to $173.7 million in the fourth quarter of 2005. Florida sales represented 49 percent of homebuilding sales in the 2006 fourth quarter compared to 81 percent in the 2005 period.

*       *       *

Spin Off of Homebuilding Division

The Company has filed a preliminary proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin off of its Homebuilding Division as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in mid-2007. Tarragon will continue to operate its real estate services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Following the spin off, Tarragon will change its name to Sage Residential, Inc. Tarragon's homebuilding and development business will be renamed Tarragon Corporation. Tarragon believes that the spin off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin off is consummated,

Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: Tarragon Corporation, which will have substantially reduced debt and higher book value as a result of its separation from the real estate services division due to that division's high level of fixed rate, non-recourse debt, and Sage, which will hold the assets of the real estate services division and associated debt. Although Sage will reflect negative book value as a result of historical-based accounting and depreciation, its net asset value, based on our current estimate of the fair market value of the assets of the real estate services division, is expected to approximate $7 per diluted share. "Sage will be a management-focused real estate services company, led by an award-winning team that has been recognized for its vision and expertise, that will be well positioned to significantly expand its net operating income and absorb additional business," said Mr. Friedman.

Mr. Friedman concluded, "Due to the effects that the timing of the spin off will have on our operating results, we will not issue guidance until the spin off is completed. Our goal for 2007 is to validate the confidence our investors have placed in the strength of our long term strategy, aggressively manage our balance sheet, and improve earnings over 2006."

Share Repurchase Program

During 2006, the Company repurchased 1,034,687 shares at an average price of $14.99 per share. No shares were repurchased in the 2006 fourth quarter.

35.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     In violation of GAAP, the Company had failed to properly account for its statement of cash flows by failing to properly classify its cash inflows and cash outflows as operating, investing and financing activities;

(b)     In violation of GAAP, the Company had failed to timely take property impairment charges and other write-downs;

(c)     Due to the deterioration in the real estate credit markets, the Company was experiencing liquidity issues due to its inability to obtain loan modifications and additional financing and there was serious doubt about Tarragon's ability to continue as a going concern; and

(d)    As the Company was experiencing a massive downturn in its business,

Tarragon would not be able to remain in full compliance with all of its debt covenants.

36.    On April 2, 2007, the Company filed a Form 8-K with the SEC, announcing in part:

On March 27, 2007, management and the Audit Committee of Tarragon Corporation (the "Company") concluded, after a review of the Company's consolidated statements of cash flows and applicable accounting standards and related guidance relating to the presentation of cash flows, that the Company's consolidated statements of cash flows should be restated to reclassify certain items among operating, investing and financing activities. In reaching its conclusion, the Company also reviewed the presentation of other companies in its industry.

Such conclusion was discussed with, and approved by, the Audit Committee of the Company's Board of Directors. Also, the restatement has been discussed with the Company's independent registered public accountants.

As a result of the foregoing, the Company intends to include in its Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 10-K") a restatement of the consolidated statements of cash flows for the years ended December 31, 2005 and 2004 included in that report. The previously filed consolidated statements of cash flows for the years ended December 31, 2005 and 2004 should not be relied upon.

37.    Subsequently, on April 2, 2007, the Company filed its form 10-K for fiscal 2006,

which included results for the fourth quarter of 2006, and included the same financial results

previously reported. The Form 10-K contained virtually identical certifications by Friedman and

Pickens as contained in Tarragon's Form 10-K for 2004, as cited above in ¶22.

38.    On May 11, 2007, the Company issued a press release entitled "Tarragon Corporation

Announces Financial Results for First Quarter of 2007; Spin-off of Homebuilding Business on

Track." The press release stated in part:

Tarragon Corporation, a leading developer of multifamily housing for rent and for sale, today announced its financial results for the first quarter ended March 31, 2007. In addition to presenting consolidated financial results in this release, the Company is including separate financial results, including net income, for its Homebuilding and Real Estate Services businesses in anticipation of the planned spin-off of its Homebuilding business.

First Quarter 2007 Consolidated Financial Results

The Company reported consolidated revenue for the first quarter of $150.4 million, compared to $114.2 million in first quarter of 2006. The loss from continuing operations was $4.4 million in the first quarter of 2007, compared to income from continuing operations of $11.4 million in the same period of 2006.

Net loss for the first quarter of 2007 was $4.2 million, or ($0.16) per diluted share. This compares to net income of $18.5 million, or $0.58 per diluted share for the first quarter 2006.

The first quarter 2007 results included $4.4 million in impairment charges and $5.5 million in depreciation expense. The financial results for the first quarter of 2007 also included $400 thousand in pre-tax gains on sales of properties, while results for the 2006 period included gains of $11.7 million, pre-tax.

"Our business model of pursuing hard to develop opportunities in high barrier to entry markets is being validated in this difficult real estate market. Income from our core developments in the Northeast and the sale of new, or recently renovated rental communities is expected to more than offset losses in our legacy condominium conversion properties in Florida," said Tarragon Chairman and Chief Executive Officer William Friedman. "Meanwhile, the Florida condominium conversions, even at today's reduced prices and sales rates, are contributing cash to rapidly reduce debt and to enhance our ability to pursue new opportunities, especially for rental and mixed use developments in the Northeast. This approach positions the Company favorably for the planned spin-off of our homebuilding business later this year."

Total consolidated debt reduction, before new borrowings, during the first quarter of 2007 was $65 million, including over $23 million related to completed condominium conversion projects. By year-end 2007, Tarragon presently expects to repay approximately $125 million of consolidated debt on condominium conversion communities, $130 million on newly built, for-sale developments and $165 million on rental apartment developments.

"We build and renovate rental communities to sell at a profit. In 2007, we expect to sell five rental communities for over $300 million. Proceeds from these sales will put both our Homebuilding and Real Estate Services businesses in a stronger position to respond to new opportunities," said Mr. Friedman.

Homebuilding Business Financial Results

The Company's Homebuilding business sales, including revenue from unconsolidated properties, were $130.5 million for the first quarter of 2007, compared to $111.9 million in the first quarter of 2006. Homebuilding net loss for the first quarter of 2007 was $1.1 million as compared to net income of $10.9 million for the first quarter of 2006. The decrease was primarily driven by margin reductions in Florida condominium conversion projects over the past year and impairment charges of $4.4 million in the first quarter of 2007 compared to none the same period

a year ago. Mr. Friedman commented, "Our goal for 2007 is to reduce debt on our condominium conversion properties and to access our capital now invested in these assets for other opportunities. To keep sales moving, especially in Florida, we are aggressively pricing our homes. These sales will comprise a substantial portion of the results of our homebuilding operations for much of 2007. However, as the year progresses and we dispose of much of our existing condominium conversion inventory, we expect to see a return to more normal margins and have significantly improved our balance sheet, both in terms of liquidity and debt. So as difficult as it may be to our current earnings, it is the right path to long-term stability and profitability for our homebuilding business."

Real Estate Services Business Financial Results

The Real Estate Services business had rental revenue of $26.6 million in the first quarter of 2007 compared to $22.7 million in the same period of 2006. Net operating income for the first quarter of 2007 was $13.8 million compared to $10.7 million in the first quarter of 2006. Real Estate Services' first quarter 2007 net loss was $3.1 million, after pre-tax depreciation expense of $5.5 million, compared to first quarter 2006 net income of $7.5 million after pre-tax depreciation expense of $3.4 million. First quarter 2006 results included pre-tax gains on sale of real estate of $11.7 million compared to pre-tax gains of $400 thousand the first quarter of 2007. There was $14.7 million of interest expense in the first quarter of 2007 compared to $5.4 million in the year ago period. This increase was primarily due to the transfer of several properties from the Homebuilding business to the Real Estate Services business at the end of 2006. In addition, $5.7 million of interest was capitalized in the first quarter 2006 compared to none in the current quarter.

Homebuilding Business Operations

Sales, Orders and Backlog

In the first quarter of 2007, the Company's homebuilding business wrote 283 net new orders totaling $84.7 million at an average sale price of $299,000, compared with 461 net new orders totaling $105.1 million for the same period in 2006 at an average sale price of $228,000. The Company delivered 353 homes in the first quarter 2007 for $83 million, at an average price, excluding land development, of $244,000, compared with 663 homes for $156.3 million, with an average price of $241,000, in the first quarter of 2006.

At the end of the first quarter of 2007, the backlog was $245.7 million representing 647 homes compared with $376.1 million at the end of the first quarter of 2006 representing 1,592 homes. The average contract price, excluding land development, was $437 thousand at March 31, 2007 compared to $289 thousand at March 31, 2006 as a result of an increase in Northeast contracts included in backlog. As of March 31, 2007, 55 percent of the backlog value is derived from contracts written in the Northeast, up from 18 percent a year ago.

Active For Sale Projects

At March 31, 2007, Tarragon's active for-sale communities (including backlog) totaled 3,811 homes in 33 communities, representing approximately $1.3 billion in projected revenue, compared to 7,948 homes in 44 communities representing about $2.4 billion in projected revenue at March 31, 2006. The $1.3 billion of active, for-sale developments as of March 31, 2007 is comprised of 45 percent new mid- and high-rise buildings, 30 percent condominium conversions and 25 percent new low-rise developments. These communities are currently expected to generate gross margins of 19 percent, 8 percent, and 21 percent, respectively. Overall, a 16 percent average gross margin is anticipated on homes in the active communities. Included in our gross margin are marketing and selling costs and development overhead representing approximately five percent of homebuilding revenue.

Active For Rent Projects

The homebuilding business continues to build rental communities and currently has eight projects, representing 2,561 apartment homes, in various stages of development. Five of these communities comprising 1,631 apartment homes are expected to remain with the homebuilding business following the proposed spin-off and three representing 930 apartments will be owned and operated by the Real Estate Services business, to be renamed Sage Residential Services post spin-off

*        *        *

Spin-Off of Homebuilding Division

Tarragon has filed a proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its Homebuilding business as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in the third quarter of 2007. Tarragon will continue to operate the Real Estate Services business, which provides asset and property management, leasing and renovation services to residential and commercial properties. Following the spin-off, Tarragon will change its name to Sage Residential, Inc. Tarragon's Homebuilding business will be renamed Tarragon Corporation after the spin-off. Tarragon believes that the spin-off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin-off is consummated, Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: the Tarragon Corporation Homebuilding business, which will have substantially reduced debt and higher book value as a result of its separation from the Real Estate Services business due to its high level of fixed rate, non-recourse debt, and Sage Residential, which will operate the Real Estate Services business and hold the assets and

associated debt. Although Sage Residential will reflect a negative book value as a result of historical-based accounting and depreciation, its net asset value, based on the current estimate of the fair market value of the assets of the Real Estate Services business, is expected to approximate $6 per diluted share, assuming 30 million shares outstanding.

> Share Repurchase Program.

> No shares were repurchased in the first quarter of 2007.

39.    On May 11, 2007, the Company filed its Form 10-Q for the first quarter of 2007,

which included the same financial results previously reported. The Form 10-Q contained virtually

identical certifications by Friedman and Pickens as contained in Tarragon's Form 10-K for 2004, as

cited above in ¶22.

40.    On July 17, 2007, *Bloomberg* published an article about Tarragon's restatement. The

article, by Jonathan Weil, stated in part:

> The official mission of the auditing profession's watchdog is "to protect the interests of investors." In practice, what it really protects best are the dirty secrets of the accounting firms and their corporate audit clients.
>
> Created in 2002 by the Sarbanes-Oxley Act, the Public Company Accounting Oversight Board inspects the firms that audit companies with U.S.-traded securities. In its brief history, the board has identified scores of companies where outside auditors have done lousy jobs checking the books. Investors crave that kind of knowledge.
>
> In its reports to the public, though, the board doesn't name the companies. So last month, for instance, when the board released its annual inspection report on Grant Thornton LLP, the sixth-largest U.S. accounting firm by revenue, one of the audits it criticized was at a company identified only as "Issuer A." Transparency, this isn't.
>
> The report said Grant Thornton failed "to obtain sufficient competent evidential matter to support its audit opinion" and "failed to identify" an accounting violation "that it should have identified and addressed before issuing its audit report."
>
> In a response letter, the firm complained about the harsh wording and said it actually had identified the problem. The violation: Issuer A, which restated its financials last year, had left off its balance sheet a certain 90 percent-owned partnership, the rest of which was owned mainly by company insiders.

What's Missing

**Here's what the report left out: Issuer A is Tarragon Corp., a New York-based real-estate developer awash in Florida condominiums.** Last year's restatement slashed 2005 net income 39 percent to $88.5 million. And Grant Thornton remains its auditor. Faced with those facts, some investors during proxy season almost certainly would vote to fire the auditor and perhaps even withhold votes from directors who sit on the company's audit committee.

41.     Following this news, within days, Tarragon's stock collapsed from above $8 per share

to just $4 per share.

42.     On July 25, 2007, the Company issued a press release entitled" Tarragon Corporation

Comments on Unusual Trading Activity." The press release stated in part:

Tarragon Corporation, a leading developer of multifamily housing for rent and for sale, today commented on unusual trading activity in its common stock that has occurred over the past two days and that has resulted in significant price volatility. Tarragon's policy is not to respond to specific rumors or speculation in the market; however, there has been no material change to the Company's business outlook, financial position or any other aspect of its business that would account for such trading activity.

Tarragon Chairman and Chief Executive Officer William Friedman commented further, "We recently announced a sequential quarterly sales increase of nearly 100% in our Florida condominium conversion communities, demonstrating that we're continuing to manage the challenges we face in that market. We're also making excellent progress toward our 2007 debt reduction goals and expect to reduce consolidated and unconsolidated debt on condominium conversion communities by approximately $125 million and $130 million in debt on newly built, for-sale developments. Over the next few quarters, we expect to close sales of over $600 million of completed rental properties which are expected to generate over $450 million in debt repayment and approximately $150 million in net cash proceeds as we execute our strategy to improve our balance sheet before, and after, the spin-off of our homebuilding business."

Additional Information About the Spin-Off Transaction

Tarragon has filed a preliminary proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its homebuilding business as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed during the third quarter of 2007. Following the spin-off, Tarragon will change its name to Sage Residential, Inc. Sage will continue to operate its real estate services business, which provides asset and property management, leasing and renovation services to

residential and commercial properties. Tarragon's homebuilding and development
business will be renamed Tarragon Corporation.

43.     Then, on August 9, 2007, at noon Eastern Time, the Company issued a press release

entitled "Tarragon Will Delay Filing Its Second Quarter Form 10-Q; Company Seeks to Address

Liquidity Issues; Expects to Record Significant Impairment Charges." The press release stated in

part:

> Tarragon Corporation today announced that the filing of its Quarterly Report on
> Form 10-Q for the quarter ended June 30, 2007 will be delayed beyond the Securities
> and Exchange Commission's filing deadline of August 9, 2007 in order to provide
> additional time for Tarragon to finalize its evaluation of property impairment charges
> and other write-downs necessitated by the recent decision to sell certain properties
> under current adverse market conditions. Tarragon currently expects to record
> impairment charges in excess of $125 million.

> Tarragon is currently experiencing liquidity issues caused by the sudden and
> rapid deterioration in the real estate credit markets. This has resulted in Tarragon
> being unable to complete approximately $50 million in financing transactions that
> had been under negotiation and were expected to close in August 2007.

> Tarragon's business has been adversely affected by the continuing and
> accelerated deterioration of the homebuilding industry in the markets in which
> Tarragon operates, and in the Florida market in particular. These conditions have led
> to declines in new home sales, increased use of sales discounts and other incentives
> and increased interest and other carrying costs, and have adversely affected
> Tarragon's gross margins from homebuilding sales as well as its overall liquidity
> situation. Tarragon has also incurred additional lease-up and debt service costs
> associated with apartment properties that had been targeted for conversion into
> condominiums but that it subsequently decided to operate as rental properties.

> These factors, combined with the inability to obtain anticipated loan
> modifications and additional financing, have materially affected Tarragon's liquidity,
> including the ability to repay existing indebtedness as it becomes due and meet other
> current obligations, and raise doubt about Tarragon's ability to continue as a going
> concern. In addition, Tarragon currently is not in compliance with a financial
> covenant contained in its existing subordinated debt and, after the property
> impairment charges and other write-downs discussed above are recorded, Tarragon
> will not be in compliance with certain net worth maintenance and other financial
> covenants contained in this and other debt agreements. Tarragon has not made its
> August 2007 debt service payments as well as certain other vendor payments, and
> Tarragon is seeking deferral of such payments while it continues to negotiate to
> obtain debt and/or equity financing. Tarragon also currently owes approximately
> $37.0 million under its unsecured line of credit with affiliates of William S.

Friedman, Tarragon's chief executive officer and chairman. Tarragon and Mr. Friedman have agreed that no further advances will be made under this credit line.

Notwithstanding these issues, Tarragon believes that its real estate portfolio and development platform currently have significant equity value in excess of existing indebtedness. Accordingly, Tarragon's board of directors has formed a special committee of independent directors to evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders. The special committee is retaining Lazard to act as a financial adviser to Tarragon in evaluating its alternatives. Alternatives to be considered are expected to include all available forms and sources of financing, property sales and other strategic transactions. However, if Tarragon is unable to obtain sufficient liquidity to fund its operations in the near-term, it may be necessary for Tarragon to undertake such other actions as may be appropriate in the light of its current liquidity situation. Tarragon does not intend to comment further publicly with respect to the exploration of strategic and financial alternatives unless a specific transaction or course of action is authorized by its board of directors.

Tarragon previously filed a preliminary proxy statement with the SEC related to the proposed pro rata, tax-free spin-off of its homebuilding division as an independent, publicly traded company. Due to current market conditions and the related impact on Tarragon's financial condition, Tarragon has decided to postpone the spin-off of the homebuilding business as it concentrates on addressing its existing financial requirements.

44.    On August 9, 2007, Tarragon's stock collapsed $1.88 per share to close at $0.94 per share, a one-day decline of 67% on volume of 18 million shares, 23 times the average three-month volume.

45.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    In violation of GAAP, the Company had failed to consolidate an unprofitable variable interest entity into its consolidated financial statements;

(b)    In violation of GAAP, the Company had failed to properly account for its statement of cash flows by failing to properly classify its cash inflows and cash outflows as operating, investing and financing activities;

(c)    In violation of GAAP, the Company had failed to timely take property impairment charges and other write-downs;

(d)    Due to the deterioration in the real estate credit markets, the Company was experiencing liquidity issues due to inability to obtain loan modifications and additional financing and there was serious doubt about Tarragon's ability to continue as a going concern;

(e)    As the Company was experiencing a massive downturn in its business, Tarragon would not be able to remain in full compliance with all of its debt covenants; and

(f)    Given the increased volatility in the homebuilding industry and the real estate credit markets, the Company had no reasonable basis to make projections about its 2007 results. As a result, the Company's projections issued during the Class Period about its 2007 results were at a minimum reckless.

46.    As a result of defendants' false statements, Tarragon's stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, shares sending them down more than 96% from their Class Period high.

## TARRAGON'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

47.    In order to inflate the price of Tarragon's stock, defendants caused the Company to falsely report its results for fiscal 2004 through the third quarter of 2006 through improper accounting entries, which inflated the Company's net income and manipulated the Company's cash flows. The Company subsequently has admitted that its financial statements for fiscal 2004, 2005 and the first three quarters of fiscal 2006 should not be relied upon.

48.    Tarragon included its false financial statements and results in press releases and in its SEC filings. The SEC filings represented that the financial information presented therein was a fair

statement of Tarragon's financial results and that the results were prepared in accordance with GAAP.

49.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Tarragon's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

50.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

**Failure to Consolidate Unprofitable Variable Interest Entity**

51.    Tarragon overstated its income throughout the Class Period by failing to consolidate its unprofitable variable interest entity Ansonia Apartments, LP ("Ansonia") into its consolidated financial statements in violation of GAAP.

52.    Prior to the enactment of FASB Interpretation Number ("FIN") 46(R) in December 2003, a company would consider whether or not to consolidate another entity into its consolidated financial statements based solely on financial control. If the company controlled the entity through voting interest (*i.e.*, by owning more than a 50% interest), then consolidation would generally take

place. With the enactment of FIN 46(R)[2], a company is required to assess its equity investments to determine if they are "variable interest entities" and to decide whether to consolidate the variable interest entity based on factors other than strict voting control. Variable interests may arise from financial instruments, service contracts, guarantees, leases or other arrangements with the entity. A company will consolidate the entity if it determines it is the primary beneficiary of the entity and the risks associated with the entity are not properly dispersed amongst the other owners. A company is the primary beneficiary if it will absorb a majority of the entity's losses or returns.

53.    If an investment in which a company owns more than a 20% interest does not qualify as a variable interest entity, then a company may treat the entity as an equity investment for accounting purposes. Under the equity method a company records its initial investment at the original cost. Thereafter, the company will record its proportionate share of the operating income or loss from the investment each period thereby increasing or decreasing its cost basis in the investment. When a company's investment balance reaches zero, the company will discontinue recording its shares of the loss except to the extent that the company has guaranteed any of the investment's obligations. APB No. 18, ¶¶6(b) and 19.

54.    Tarragon has numerous investments in partnerships or joint ventures. Tarragon adopted FIN 46R as of January 1, 2004, for all of its partnerships and joint ventures formed before February 1, 2003. Upon the adoption of FIN 46R, Tarragon consolidated seven partnerships and joint ventures into the Company's consolidated financial results which had previously been unconsolidated. Tarragon was not required to take any charges upon consolidating any of these

---

[2]    FIN 46(R) is effective for all non-special purpose variable interest entities for the first interim or annual period ending after March 15, 2004. In the case of Tarragon, it applied to the Company's results for the quarter ending March 31, 2004 – the Company's first quarter 2004 results.

seven variable interest entities as none of the entities' assets were less than their liabilities. Nevertheless, despite its adoption of FIN 46R, Tarragon failed to consolidate Ansonia into its financial statements.

55.    In December 1997, Tarragon formed Ansonia with Ansonia LLC in order to acquire and reposition or renovate older suburban apartment properties in central and eastern Connecticut. Tarragon was the general partner of Ansonia while Ansonia LLC was its limited partner. The principals of Ansonia LLC are:

- Richard Frary – Frary has been a member of Ansonia LLC since 1997. He joined Tarragon in April 2004 as a director.

- Joel Mael – Mael has been a member of Ansonia LLC since 1997.

- Defendant Rothenberg – Rothenberg has been a managing member of Ansonia LLC since 1997. He joined Tarragon in September 2000 as its COO and a director.

- Saul Spitz – Spitz has been a member of Ansonia LLC since 1997. He joined Tarragon in September 2000 as its Executive Vice President of Acquisition.

- Eileen Swenson – Swenson has been a member of Ansonia LLC since 1999. He joined Tarragon in September 2000 as President of Tarragon Management, Inc.

56.    In 1997, Tarragon obtained a 70% interest in the partnership due to its initial contribution to Ansonia. The outside partners did not make any monetary contributions to Ansonia at the outset but obtained a 30% interest in the partnership subject to their obligation to pay Tarragon 30% of the amounts contributed to the partnership by the Company plus interest. In August 2001, the outside partners – most of whom were officers and/or directors of Tarragon by this point – met their obligation to pay Tarragon 30% of the amounts it contributed plus interest through a contribution of $232,000 cash and the issuance of notes totaling $5.3 million. The notes, which were payable from 30% of Ansonia's net cash flow, were fully paid in 2002. In November 2005, Tarragon contributed additional properties into Ansonia in exchange for an increase in its interest from 70% to 89.44%.

57.     Here, in violation of GAAP, Tarragon failed to consolidate Ansonia's unprofitable results into its own despite the fact that it was the limited partnerships' primary beneficiary. Given its general partnership interest in Ansonia of almost 90% and the fact that the remaining limited partnership interest in Ansonia was held primarily by individuals who were directly or indirectly related to Tarragon as officers and/or directors of the Company, Tarragon should have consolidated Ansonia into its financial statements. Nonetheless, Tarragon's financial results would have been harmed had it consolidated Ansonia as it was required to do under FIN 46(R).

58.     As a result of its restatement, Tarragon was forced to record a $16.8 million charge for a change in accounting principle into its fiscal year 2004 results upon adoption of FIN 46R to take into account the difference between the assets of Ansonia and its liabilities at the time. Further, Tarragon was forced to record unprofitable results for the partnership into its fiscal year 2005 and first quarter 2006 results.

59.     Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first quarter of 2006 due to this accounting violation. The chart below demonstrates the material impact this violation had on Tarragon's financial results during the Class Period:

**Effect on Tarragon's Financial Statements**

| (in thousands except EPS) | FY04 | FY05 | 1QFY06 |
|---|---|---|---|
| | | | |
| Net Income as Originally Reported | 44,708 | 145,791 | 18,828 |
| Net Income as Restated | 29,518 | 88,498 | 18,474 |
| | | | |
| Diluted EPS as Originally Reported | $1.65 | $4.71 | $0.59 |
| Diluted EPS as Restated | $1.09 | $2.93 | $0.58 |
| | | | |
| *Overstatement in Reported Net Income* | *15,190* | *57,293* | *354* |
| *% Overstatement in Reported Net Income* | *34%* | *39%* | *2%* |

**Failure to Properly Account for Its Statement of Cash Flows**

60.    During the Class Period, Tarragon failed to properly account for its Statement of Cash Flows by failing to properly classify its cash inflows and cash outflows into the proper categories as operating, investing or financing activities.

61.    Under both GAAP and SEC Regulations, a statement of cash flows is considered to be an integral part of a full set of financial statements and is required to be disclosed on a periodic basis along with a company's balance sheet, income statement and statement of changes in stockholder's equity.    FASB Statement of Financial Accounting Standard ("SFAS") No. 95, *Statement of Cash Flows*, ¶1; FASB Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶13; and Article 3 and Article 10 of Regulation S-X [17 C.F.R. §210.3-02 and §210.10-01(c)(3)].

62.    The primary purpose of a statement of cash flow is to present information concerning a company's cash inflows and outflows during a given period.  It shows the amount of cash generated and used by a company in a specified period.  SFAS No. 95, ¶4.  Cash inflows or cash receipts relate to the cash received by the company from its ongoing operations and from external investment sources.  Cash outflows or cash disbursements relate to business expenses or investments made by the company.  In its statement of cash flows, a company is required to classify cash inflows and cash outflows as resulting from (i) its investing transactions, (ii) its financing transactions or (iii) its operating activities based upon the nature of the activity.  SFAS No. 95, ¶¶6 and 14.

63.    The statement of cash flows, along with the related footnote disclosures, should provide investors with information to assess the following:

- the enterprise's ability to generate positive future net cash flows;

- the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;

- the reasons for differences between net income and associated cash receipts and payments; and

- the effects on an enterprise's financial position of both its cash and noncash investing and financing transactions during the period.

SFAS No. 95, ¶¶6 and 45-47.

64.    Here, Tarragon failed to properly classify its cash inflows and outflows by failing to account for them in the proper category as operating, investing or financing activities. Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first, second and third quarters of 2006 due to this accounting violation.

**Tarragon's Restatement Is an Admission of Falsity**

65.    The fact that Tarragon has restated its fiscal 2004 through third quarter 2006 financial statements and has admitted that such financial statements should no longer be relied upon is an admission that the financial statements originally issued were false and that the overstatement of income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Tarragon was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." SFAS No. 154, ¶25. Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. Tarragon's restatement is due to an error. Thus, the restatement is an admission by Tarragon that its previously issued financial results and its public statements regarding those results were false.

**Tarragon's Financial Statements Violated Fundamental Concepts of GAAP**

66.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance,

those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

67. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

68. By misrepresenting Tarragon's financial statements, the defendants presented a misleading picture of its business and prospects. Thus, instead of truthfully disclosing during the Class Period that Tarragon's business was not as healthy as represented, Tarragon falsely reported its financial results and its actual business prospected going forward.

69. These claims of profitability caused and maintained the artificial inflation in Tarragon's stock price throughout the Class Period and until the truth was revealed to the market.

70.    Defendants' false and misleading statements had the intended effect and caused Tarragon stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $26.76 per share.

71.    Then, on August 9, 2006, Tarragon postponed its earnings release due to issues with its accounting, causing its stock to decline from above $11 per share to less than $10 per share. Later, on July 17, 2007, an article about Tarragon's accounting caused its stock to decline from the $8 range to the $4 per share range.

72.    On August 9, 2007, at noon Eastern Time, defendants were forced to publicly disclose that Tarragon would be required to take property impairment charges and other write-downs and that due to serious liquidity issues there was substantial doubt about the Company's ability to continue as a going concern, causing its stock to drop $1.88 per share.

73.    As a direct result of defendants' admissions and the public revelations regarding the truth about Tarragon's overstatement of income and its actual business prospects going forward, Tarragon's stock price plummeted on August 9, 2007 to $0.94 per share, a one-day decline of $1.88 per share. This was in addition to the nearly $2 per share drop in August 2006 and the $4 per share drop in July 2007. These drops removed the inflation from Tarragon's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

74.    Plaintiffs incorporate ¶¶1-80 by reference.

75.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Tarragon common stock during the Class Period.

77.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tarragon common stock. Plaintiffs and the Class would not have purchased Tarragon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

78.    Plaintiffs incorporate ¶¶1-84 by reference.

79.    The Individual Defendants acted as controlling persons of Tarragon within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Tarragon stock, the Individual Defendants had the power and authority to cause Tarragon to engage in the wrongful conduct complained of herein. Tarragon controlled the

Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

80. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tarragon common stock during the Class Period (the "Class"). Excluded from the Class are defendants.

81. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Tarragon has over 28.6 million shares of stock outstanding, owned by hundreds if not thousands of persons.

82. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Tarragon's common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

83. Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

84.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

85.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiffs and the members of the Class damages, including interest;

C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  October __, 2007               **ABRAHAM, FRUCHTER & TWERSKY, LLP**

Jeffrey S. Abraham
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

*Attorneys for Plaintiffs*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

**Paul Berger**, hereby certifies that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the attached Class Action Complaint filed with respect to Tarragon Corporation ("Tarragon") and have authorized counsel to file a similar complaint or to otherwise add my name as a lead plaintiff in these proceedings.

2.    I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial if necessary.

4.    To the best of my knowledge, the following are my transactions in Tarragon common stock during the period from January 5, 2005, through and including August 9, 2007, as set forth in Exhibit A hereto.

5.    Within the last three years, I have not sought to be a class representative in the following cases brought pursuant to the federal securities laws. I did file an action, Berger v. Alvarion, Ltd. et al., 07 CV 1007 (S.D.N.Y.) which I subsequently voluntarily dismissed after the action was transferred to the U.S. District Court for the Northern District of California and I was not appointed a lead plaintiff in the action.

6.    I will not accept any payment for serving as class representative on behalf of the class beyond my pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

Signed under the penalties of perjury this 5th day of October, 2007.

Paul Berger

## EXHIBIT A

| DATE | NUMBER OF SHARES | TOTAL | PER SHARE |
|------|------------------|-------|-----------|
| **Purchases** | | | |
| 28-Feb-05 | 1,000 | 21,389.95 | 21.39 |
| 22-Mar-05 | 1,000 | 21,609.95 | 21.61 |
| 11-May-05 | 1,000 | 23,209.95 | 23.21 |
| 11-May-05 | 2,000 | 46,609.95 | 23.30 |
| 11-May-05 | 1,000 | 22,759.95 | 22.76 |
| 28-Jun-05 | 1,000 | 24,509.95 | 24.51 |
| 28-Jun-05 | 1,000 | 24,709.95 | 24.71 |
| 15-Jul-05 | 1,000 | 24,009.95 | 24.01 |
| 15-Jul-05 | 1,000 | 24,329.95 | 24.33 |
| 19-Jul-05 | 1,000 | 26,859.95 | 26.86 |
| 27-Jul-05 | 500 | 13,109.95 | 26.22 |
| 02-Aug-05 | 1,000 | 24,839.95 | 24.84 |
| 08-Aug-05 | 1,000 | 23,499.95 | 23.50 |
| 09-Sep-05 | 500 | 10,684.95 | 21.37 |
| **Sales** | | | |
| 10-Mar-05 | (1,000) | (22,189.31) | 22.19 |
| 11-May-05 | (100) | (2,294.95) | 22.95 |
| 28-Jun-05 | (5,900) | (144,538.09) | 24.50 |
| 22-Jul-05 | (2,000) | (53,027.84) | 26.51 |
| 19-May-06 | (2,000) | (32,509.05) | 16.25 |
| 11-Dec-06 | (1,500) | (18,218.24) | 12.15 |